We'll hear argument first this morning in Case 13-854, Teva Pharmaceuticals v. Sandoz. Mr. Jay? Mr. Chief Justice, and may it please the Court, in our judicial system, the trial judges find the facts. Courts of appeals review those fact findings deferentially under Rule 52. The Federal courts apply that familiar standard even whenever the ultimate question is one of law, but it rests on subsidiary fact finding. Now, the Federal circuit says that claim construction is different, that there are no facts in claim construction. But more than 100 years of practice from this Court makes clear that that's not right. Facts can enter claim construction, and they do so when the trial judge does what this Court has instructed her to do, to find what a person of skill in the art already knows as relevant to interpreting the patent. Can you bring me down to this case and tell us what are the facts to which the Federal circuit should have applied clearly around this rule? Certainly, Justice Ginsburg. There are three in our view. The first is that the Federal circuit failed to defer to the trial court's finding about the presumed meaning of the term average molecular weight in the relevant context. The second is that the Federal circuit failed to defer to what the district court expressly found, resolving an expert dispute, was the import of Figure 1 and where the peak of the curve in Figure 1 appears. And the third is how a person of ordinary skill in the art would have read a piece of the prosecution history. So if I may, I'll begin with why the reference to average molecular weight in the patent and the specific reference to size-exclusion chromatography, the particular technology being used to find that, fits the rule that we're asking this Court to adopt. I want you to answer that, but would you say that it's whether a skilled artisan would make this inference? Is that part of the finding? Part of the finding is the knowledge of a skilled artisan, that's right. Sometimes the finding is just about pure science, how an invention works, what this case is, terms of art or the state of the art. And the way the state of the art can enter the analysis is when you're using science to construe the patent. So, for example, at this temperature, the invention would work. At that temperature, the invention would not work. Therefore, you know, the temperature must be Celsius and not Fahrenheit, for example. When you do that, when you're using science and not words or structure as an interpretive guide, that rests on fact-finding just as much as knowing the meaning of terms of art to people skilled in the art does. Now, the terms of art has a lengthy pedigree in this Court's cases, not just in patent cases, although it's certainly strong in patent cases as well, but in the interpretation of other written instruments. The meaning of terms of art in a community to which, an interpretive community to which the trial judge does not belong, is exactly the kind of thing that trial judges determine. Well, that's not true of terms of art in statutes, is it? Terms of art in statutes, Justice Alito, are not or nonetheless written to be read by the general public. And when they have a legal meaning, the determination of that legal meaning is still a question of law. Some of them are very technical. And I doubt that the general public has any understanding of some very technical terms that appear in statutes. So would they not be read in light of what someone who was knowledgeable in that field would understand the term to mean? I think it's very rare for Congress to adopt statutes that have terms that are meant to be read by a specialized audience. Well, I'll give you an example. The Dodd-Frank Act refers to Tier 1 capital. Do you think that the average person on the street has any idea what Tier 1 capital is? I expect that it has an established meaning, but although I certainly don't know for sure. Among the general public or among people who are knowledgeable in that particular area? I think when you're interpreting a statute that it's generally clear at least what the right frame of reference is. Now, in the patent case, what the frame of reference is, is itself a question of fact. As this Court said in Graham v. John Deere, ascertaining the level of skill in the art. Who is the skilled artisan? Who is this patent written for? That is itself a factual question. And then figuring out what that person knows is also a factual question. You know, that's terms of art or the state of the art. Mr. Jay, could you tell me what you see as the difference between your position and the government's? I think that the government agrees with us that the answer to the question presented is that Rule 52a applies and that clear error review should apply to findings of fact. I think that's the case. To some, because they differentiate others. I think that our test is largely the same as well, but we disagree on how the test comes out on these facts. We submit that the three fact findings that I mentioned to Justice Ginsburg at the beginning of the argument, they are factual findings. The government agrees that some but not all, and we agree on the ultimate disposition that the Federal Circuit's judgment can't stand. Sotomayor, if you and the government can't agree, why should we defer to a district court? Why don't we defer, as has been done now forever, to the Federal Circuit and let them review these things to know? Respectfully, Justice Sotomayor, what's been done forever is deferring to district courts on matters of subsidiary findings, and I think it's significant that in the first patent case that came to this Court from the Federal Circuit, the then-new Federal Circuit, Denison, what this Court did was direct the Federal Circuit to apply deference to subsidiary fact-finding in the context of obviousness. And this Court is not going to do that. Sotomayor, in Markman, we talked about claim construction being an odd hybrid. It is an odd hybrid. Well, it is a hybrid. I don't know that it's odd, Justice Sotomayor. I think that it actually fits of a piece with other mixed questions of law and fact. And the universal practice for mixed questions of law and fact is that when they rest on subsidiary fact-finding, you review the fact-finding part deferentially, even when the leap from the fact-finding to the ultimate legal conclusion is a short one, a non-patent living. Kennedy, in the Markman context, the trial judge says to the jury, now, the construction of the claim is for the Court, and the Court's construction of the claim is XYZ. Could that determination by the district judge, which is for the trial judge, involve some subsidiary questions of fact as to which he must be given deference? I'm sorry. I may have missed the figure. It's a jury case, like Markman. And Markman says the construction of the claim is for the Court. And the Court tells the jury that this claim is to be construed as follows, ABCD. Does that determination, that interpretation by the district court, would that error contain factual determinations as to which deference must be given to the trial judge? A claim construction can contain factual determinations. It might not. In many cases, it will not, because the ultimate question is a question of law. And when it rests just on looking at the words in the patent and applying the canons of claim construction, it remains a pure question of law. When facts enter the analysis, those facts decided by the trial judge in the context of findings are reviewed deferentially. Scalia. Scalia. Is it the same question, whether a particular fact has to be submitted to the jury and whether a particular fact finding by the judge is entitled to deference? Are they the same question? They're not the same question, Justice Scalia. I didn't think they were. This Court resolved the judge-jury question for claim construction in Markman. But there were no subsidiary fact findings of the type that we've been talking about in Markman, because Mr. Markman's expert was an expert in document construction. That's not the kind of rule that we're advocating here. We're advocating for deference to classic fact-finding resolutions. You've referred several times to subsidiary facts. You know, the difference between questions of law and fact has not always been an easy one for the Court to draw. What do you mean by a subsidiary fact? I simply mean, Mr. Chief Justice, that the ultimate question this Court said in Markman is a question of law, but it often rests on factual findings, knowledge of the State of the Art and of how the art works. And that's just as true in other cases. Well, what's your definition of subsidiary fact? A subsidiary fact is a fact that is not the ultimate question the Court is looking at, but one that is an ingredient in that judgment. So in the context of claim construction, what often happens is the beginning of the analysis is, what is the meaning of this specialized term to people in the art? That may not be controlling because the interpretation of the patent may show, as a legal matter, that that can't be the right meaning because the text of the patent itself, under the – applying the canons of claim construction, for example, or simply applying the patentee's own definition, rule out the ordinary meaning to skilled artisans, making that finding irrelevant. Then it wouldn't be a subsidiary finding of the ultimate claim construction at all. Then the evidence shouldn't have come in. I'm sorry, Justice Ginsburg. The evidence should not have come in. Well, Justice Ginsburg, the Court may not anticipate at the time what the ultimate outcome is going to be. At the time, the Court must make a judgment about which experts to allow. But I think that's an important point, that the judge retains gatekeeping authority, and ultimately the judge will decide how many terms she will allow the parties to dispute and which – what evidence to take and in what form to take it. So – If these are truly bad questions, then what happened to the Seventh Amendment? I think, Justice Ginsburg, first of all, this is not a jury case, but I'll – but of course, I'll answer the question for patent cases more broadly in which some are jury cases. These are subsidiary fact findings that go to a threshold question for the Court. And in that respect, they are no different than the fact findings that go into other pretrial judgments that are not for the jury. Rule 52 has been applied to judicial fact finding in any number of jury cases. Pretrial and post-trial matters that don't – that don't go to the jury. And this Court decided in Markman that the ultimate question of claim construction is one of law, and that's not for the jury. And the government's brief said, and I think you agree with this, but you'll tell me, that inferences to be drawn from fact findings get their noble review. And my understanding is that in a typical civil case, a jury finds the facts and can draw inferences from the facts. But here, well, first, do you agree with the government that inferences from the facts get their noble review? No, I don't think I can agree with that, Justice Ginsburg, because that's not what Rule 52 says. And we may be conflating jury cases, and in our colloquy here, we may be conflating jury cases and judicial fact findings, because, you know, the scope of Rule 52 is set out in the rule itself and in the advisory committee notes in 1937 and this Court's decision in Anderson, and Pullman Swint as well, all talk about the inferences to be drawn as being part of the trial judge's role, because the trial judge has heard the entire factual record. The trial judge is in the best position to draw the inferences from the record as well as to resolve direct head-to-head conflicts. And if you're a lawyer, you can draw the inferences from the record. Kagan. I just want to make sure I understand your answer to what the gap is between a certain kind of fact and then the ultimate question of law. So when an expert gets on the stand and gives testimony about what a person in the field, a skilled artisan in the field, would understand to be the meaning of a particular patent term, and you're saying that that's a – that's factual and that the decision whether to credit that or not is a factual determination, but how is that different from the ultimate legal question that the Court has to answer, which is kind of the same thing, which is how a person, a skilled artisan in the field, what that person would understand the patent to mean? Well, the difference is that the instances, and there will be frequent, where it's not kind of the same thing. Let me spell that out. The first part of your question is, is that – is what the expert says factual, the meaning to skilled artisans? And it absolutely is, just as it is in this Court's contract and tariff cases, where the Court specifically says that the meaning of a term to people in a particular field to which the judge doesn't belong, that's a fact question. And so is whether there is a specialized meaning. But where there is no specialized meaning or any specialized meaning is irrelevant, because the patent itself, through the process of document construction, tells you what the answer is. So, for example, here's the ordinary meaning of this term, but that won't work in the context of this patent because it would run up against the canon of claim differentiation. That won't work in this patent because it would make the invention not work. That wouldn't work in this patent because then the preferred embodiment in the – in the – in the specification wouldn't be encompassed. Are you saying that in certain cases the factual finding truly is the legal determination but that in other cases other matters can come in to drive a wedge between the two? Correct. And I think that this is a case where the facts come very close to pointing to the correct outcome, because to two cases, and this is part of Justice Kagan's question, I think. Case 1, district judge says a reasonable police officer would think this is probable cause. Case 2, a person skilled in the art would think that this was an average molecular weight. Do the courts give the same deference or lack of deference in each case? I think, and I understand your question, Justice Kennedy, in each question the person on the stand is actually opining about the ultimate question. But if I may, in each case, for example, if the question is did the police officer see the gun, that may rest on a credibility finding about whether the police officer is telling the truth or lying. The resolution of that question may be absolutely dispositive of whether there was probable cause or not. On and off, one way there's probable cause, the other there isn't. But it's still underlying factual finding. Scalia, or the law. Scalia, I don't agree with your response to Justice Kagan. To say that the fact finding will be dispositive of the legal question is not to say that it is the same as the legal question, which is what I think you responded. I don't think it's the same as the legal question. The legal question is are you liable for violating this patent? And indeed, it may be that given a particular meaning that is established by a factual finding, the outcome is virtually dictated. But it is not the same. It is not the same question. I do agree that it's not the same. It's not even the same as the ultimate question of claim construction. But the step from the factual finding to the claim construction may rest on something as simple as this. There is nothing else in this patent to get me, the judge, off of the ordinary meaning of this term to people of skill in the art. But how would you define the standard? I mean, it's absolutely true what Justice Scalia says, that at a certain level of generality there is a gap. But I thought that in order to determine liability, what the Court has to inquire into is how a person with ordinary skill in the relevant art at the time of the invention would understand the claim. And that seems like exactly the question that the expert is testifying to. The expert is not testifying to how the person of ordinary skill would understand the patent writ large. And the patent, that is the ultimate question for the Court. What the expert can testify to and what Dr. Grant testified to in this case is how particular terms in the patent have a recognized meaning within the art. The art is not going to take a position on how the doctrine of claim differentiation applies, for example. But the skilled artisan can testify about what the established meaning of the particular term is. Breyer. Let me try this. If you don't agree with it, just say no and I'll stop, okay? Okay. I thought the classical distinction is pretty much what I think Justice Scalia was driving at, that there are a certain number of factual questions where the question is of the kind, does this label belong on this thing, this thing being not in dispute? It might be a South African yellow canary up there. The statute might use the word South African yellow canary. But we are not certain whether that is a South African yellow canary. If we call in a bird expert who looks at it and says it is, that is a question of fact. If we call in a lawyer to say how are these words being used in the statute and does that fit within it, then it is a question of law. I think that that's basically right, Justice Breyer, that in this case you have an expert who came in to testify about why these terms have a particular meaning. Breyer. But we also have the Federal Circuit in the two cases where you disagree with the government accepting the fact that, in fact, the experts or the lawyer who talked to the patent guy did use the wrong words. They accept that. And then what they say is, well, in their view it is that that didn't really concern the Federal Circuit, but for the weight that the judge gave when trying to interpret the terms in the patent. And that, at least, is a legal question. Have I got that right, basically, what the argument is? That's more or less what they've said. What do you say in response? I say two important things in response. One is that in predicting what the Federal Circuit would do under the correct standard, I don't think you can disaggregate the pieces of its incorrect analysis, because it rested on the view that everything went in favor of Respondents and nothing went in favor of Petitioners here. But the second thing is, this is also very important, on the — you alluded, Justice Breyer, to the prosecution history piece, but that skips over the very important piece of what the specification, the use of size exclusion chromatography, as the technique in the specification teaches. And as the district court found, page 43A, 44A of the Petition Appendix, the presumed meaning of that term, average molecular weight, when you're using this technology, is peak average molecular weight. And the — there are other technologies, such as osmometry and light scattering, that give rise to a different presumed meaning of what average molecular weight is, because they produce different measurements. But the only kind of peak average that you can read from the chromatogram is peak average molecular weight. And the Federal Circuit went right by the finding that the presumed meaning would be peak average molecular weight and gave — essentially treated the three possibilities, peak, number, and weight average, as though they were equal. But that's not what the district court found in the context of this technology. Alito, in a recent law review article written by two authors, one of whom is a deputy — is the deputy solicitor in the Patent and Trademark Office, the office there, the author said that they surveyed a very large number of cases to try to find any in which the difference between de novo review and clear-error review of factual questions by the Federal Circuit made a difference in the outcome. And they couldn't find any case in which this fascinating legal debate had a practical significance. Now, you want to introduce a level of complication to this. The Federal Circuit says de novo for everything. And you want the courts — you want the Federal Circuit now to struggle to determine which are factual questions as to which there's clear-error review, which ones get de novo review, whether it's the ultimate question. Is it worthwhile? Does it practical matter? It is, Justice Alito. I'd like to respond to your question, and then if I may, to reserve my time for rebuttal unless you have follow-up. First of all, does it matter? It does matter. It matters in cases like this. And I don't know whether the study that Your Honor referred to would pick up this case, because that's precisely the problem. If you read the Federal Circuit's opinion in this case, it makes no reference to the fact findings as fact findings. And you would not understand, for example, the finding that I was just alluding to about presumed meaning, because it's not referred to anywhere. There are a host of cases like that. There have been for years. And more systemically, as Professor Minnell points out in his amicus brief, I think the de novo standard produces the problem that encourages the Federal Circuit to blow right by the skilled artisan's perspective. It doesn't talk about it. It doesn't talk about the evidence that supports it. So that's one point. Another point, just about whether the Federal Circuit could handle this, this is the standard disaggregating subsidiary factual questions from ultimate legal questions, that courts of appeals apply all the time and that the regional courts of appeals did in fact apply before the Federal Circuit came along. The best example of that is the Harries case we've cited in our brief written by Judge Hand. So to apply that standard practice, we think, would not be unduly disruptive to the Federal Circuit, and it would not insulate every single claim construction from review. It simply would make the — have facts treated as facts. If I may, I'd like to reserve the balance of my time. Roberts. Thank you, Mr. Jay. Ms. Anders. Mr. Chief Justice, and may it please the Court, just to start with the distinction between factual findings and legal inferences here, we think that factual findings are those that are based at least in part on evidence that is outside the patent and its prosecution history, and that concern matters that are distinct from the patent itself. So those could be factual findings about what kind of data a particular scientific technique produces or how the inventions, prior inventions in the field worked. Those are factual findings. We then think that when the district court takes those findings, and now it can understand the concepts that are described in the patent because it's made these findings, when the district court takes those findings and then looks at the patent and asks, how would a person of skill in the art interpret the words in this patent in light of all the pieces of the patent document and the canons of claim construction, those inferences that it draws are legal ones. So I think to take the size exclusion chromatography as an example of this, because it's probably easier to discuss it concretely. I think what happened there was that the district court made a factual finding that when SEC is used, the type of data that just is spit out is – produces peak molecular weight. And if you wanted to produce any other measure of molecular weight, you would need to do more calculations. That's the factual finding that the district court made. It then took a look at the patent document and said, in light of that, what inference can I draw from the specifications referenced to SEC? And the legal inference that it drew was that probably the patent meant to refer to peak molecular weight when it used the term molecular weight. And I think the court of appeals understood the factual finding in the same way that the district court did. I think it accepted that when you use SEC, the data that comes out is MP, and you would need further calculations to produce other types of data. But what the – Ginsburg. Why do you reject what Mr. Jay tells us were also fact findings? I'm sorry, Justice Ginsburg. I think you have just told us that the peak, that that's a fact finding. But you don't accept the other two things that Mr. Jay characterized as fact findings. Can you tell us why not? Well, to take SEC first, I think what – I think we agree that SEC, which is the use of size exclusion chromatography in the specification, I think we agree that it's a fact finding to say that if you use SEC, then peak molecular weight is produced, and that you'd need further calculations to do other things. The district court then made a legal inference where it said because the specification uses SEC, we know that the patent, in the context of the patents in suit, and this is a quote from the district court's opinion, in the context of the patents in suit, the meaning of average molecular weight must be peak molecular weight. That's a legal inference because it's taking one part of the document and using it to interpret another part of the document. The Court in Markman said that that is classic textual analysis. When you look at the patent and you say this part of the specification tells me something about the claims. So we think with respect to SEC, what the Federal Circuit did was it disagreed with the legal inference that the district court made. Kagan. But suppose an expert just says, in my field, skilled artisans think that molecular weight means the following. Is that a – and then the district court accepts that finding. Is that a factual determination in your view? Because I think Mr. Jay would say it is. I think – well, first of all, that's not what the district – what the expert testified to here, what the district court found. So I think we disagree about what the district court actually said in its opinion. But if that were what the expert testified to, then I think that would be a statement of fact, that in the world we understand generally that SEC means MP. I think that would be a finding of fact. But I would make two points about that. The first is that there's then a significant legal analysis that the district court has to do to figure out how to construe the patent. And I think that's particularly clear in the context of indefiniteness, which is what this case is about, that even if the district court has some evidence that generally artisans might understand a term in a particular way, the court then has to look at the claims themselves, the terms that surround the term we're trying to construe, the specification, the embodiments in the specification, the prosecution history, it has to look at all that and decide, given all that, would a person of skill in the art be reasonably certain about how to construe this patent? So that is the legal inquiry that the court would have to do after receiving the fact finding. Roberts. Under your view, two different district courts construing the same patent could come out to opposite results based on a subsidiary factual finding, and neither of those would be clearly erroneous, and yet on a public patent that's going to bind a lot of other people, people won't know what to do. You have two different interpretations of the patent. What happens then? Well, I think that concern is overstated for two reasons. I think the first is that it's pretty unlikely that that scenario is going to occur, and the second is that even in the rare circumstances in which it did, there are reasons to think that that's not actually a problem from a policy standpoint. So just to elaborate on that, I think because this inquiry needs to remain primarily legal, because even after the court makes fact findings, it needs to engage in a contextual analysis of the patent as a whole in light of the canons of claim construction, we think the legal questions are generally going to predominate in the analysis of those cases. Roberts Well, that's just kind of avoiding the question. I mean, you can easily envision this case coming out differently in the district court depending upon what district courts find is the, you know, accepted understanding to Artisans. And again, each of those opposite results, neither one may be clearly erroneous. Well, I think another point is that district courts, I think, have a way, have ample tools to try to avoid that scenario from occurring. They can, when there are seriatim cases, there can be pretrial coordination in the same district so that the situation doesn't arise. Of course, preclusion will prevent a patentee from having an issue of claim construction decided against it and then coming back and trying to relitigate the issue. Breyer What do we do when there's a bus accident on a technical thing and different people who were injured sue in different places at different times? Same problem, isn't it? I'm sorry. Breyer Same problem. I mean, you can think of a thousand cases like that where you have a big bus accident, technical problem with the motor, different place, people from different places who were victims and they sue in different places at different times. Juries or tried to the bench, they could reach different factual conclusions. I think that's exactly right. Breyer No, that's not true. What do we do? It's because you have a patent, which is a public document, that is binding the world in terms of what other inventors can do. And another inventor looking at it says, well, what can I do? He doesn't know. That's very different than just the particular negligent case that comes up. Breyer I was actually curious what we did, because I can think of examples in antitrust, I can think of examples in corporate law, I can think of examples versus every area of the law, where often it does have, as the Chief Justice says, it could, the different factual things, have enormous public implications. What I was interested in and asked because I wanted to know, what are the legal devices for dealing with that? Well, I would make two points. I think that, first, because of the way preclusion works, it only runs against the patentee, right? So if the patentee loses on an issue of claim construction or indefiniteness, he cannot then relitigate that issue, but other accused infringers can relitigate it and try to build a better record. We actually think that that keeps this from being a policy problem, the possibility that you could have a subsequent decision that reaches a different conclusion. I guess a deed, a deed is a private document that has public effect, right? It prevents certain people from trespassing on the property that is conveyed. And I suppose that could be construed in the various courts that reach different results. So the mere fact that this binds the public is not conclusive. I think that's right. And, of course, in the patent system now, there's toleration of a certain amount of disuniformity, and I think that's because we generally think that there are other values that supersede that uniformity. So, for instance, you could have, in the case of infringement, you can have two different accusers in different suits. One makes a better record than the other, and the patent could be held to infringe one product but not infringe another material with a similar product. The same thing can happen in the case of infringement. You're saying that factual findings that are subject to clear error review must be, quote, "...in some sense distinct from the meaning or validity of the patent." I don't understand what that means. When the issue is the meaning or validity of the patent, if the evidence is relevant, then it is — there's a connection. So what does that mean, in some sense distinct? Well, it means that the district court is making a finding based on science, based on expertise, somebody's expertise in the field, and making a finding about a matter that isn't just what does this term mean in the patent. It's making a more broad finding. So, for instance, what does this type of scientific process, what type of data does it produce? You could say that's related to the patent because, of course, the patent uses SEC, and one question is what kind of data does it produce. But it is also finding a fact to say, as a general matter, the way science works is that SEC produces MP without further calculation. Well, that sounds like every factual finding. It sounds like you're saying that anything that's a factual issue is subject to clear error review, but I thought you were saying something less than that. Well, I think that's a factual finding, but then what the district court has to do is take that information, which allows it to assume the perspective of a skilled artisan, and then decide what it tells it about the patent itself. And that's a question of looking at the document itself. So the fact that the patent uses SEC, does that raise an inference about what the term molecular weight in the patent means or not? That's a question of textual analysis. Thank you. Ms. Andrews. Mr. Phillips. Thank you, Mr. Chief Justice, and may it please the Court. It seems to me that the two questions that were asked in the opening portions to my colleagues and friends, one came from Justice Alito, one came from you, Mr. Chief Justice, are matters that this Court already has effectively decided in the Markman case and are the reason why de novo review is appropriate under these circumstances. In effect, Justice Alito asked the question, is all of this worth the candle? Because the debate between the government and the Petitioner in this case and the difficulty of trying to decide which facts do you defer to and which ones don't you defer to and when is it a credibility determination, when is it not, this Court said unanimously more than 15 years ago in Markman that all of those kinds of issues get subsumed within the fundamental question of how best to interpret the patent and that that's the ultimate question, that that's a legal question, and therefore, all of the disputes, factual in nature, however you want to describe them, get subsumed within that. It seems to me the final, the ultimate conclusion from that, then, is whatever determination is made is ultimately subject to de novo review. Breyer, I just dealt with judge-jury, not which court gets the fact up, decides the facts, basically, which is where I do start. But if I take that as a given, then I'd say why should we treat facts matters here any different than any other case? The main reason for letting the district judge, I've always thought, decide facts as an initial matter in a technical case is because there are all kinds of facts, you know. We happen to have some particularly odd definitional ones here, but there are all kinds of facts. In technical cases, there are all kinds of facts. And the traditional reason is he's seen the witnesses, but there is one thing he's done that the court of appeals has not done. And in a technical case, it seems to me that makes an enormous difference. He sat there the whole time and listened to these experts talk. Actually, that's not true. And that, I think, is a very powerful reason for saying in a technical case, don't overturn the judge's factual findings, whether they are particularly scientific matters, but no particularly here, unless those three judges who will not even read the whole record normally and certainly won't hear those witnesses, don't let them do it unless they are convinced that it is clearly erroneous. Now, that's the argument, and I would like to say that's different from a statute. Where they're not, it is different from, it's different from, it's the same as any technical case. Now, why is this different? I think that's the question the Chief Justice asked, which isn't it possible and isn't it likely? I mean, we gave you the example of seven district courts interpreting three. I mean, that same thing, as we know, could happen in dozens of technical cases. And you go on importance. I could make up some important hypotheticals. You want trivial ones, I'll make up some of those. You want to put a definition on a thing, fine. You know, we can all, both, and you're probably better than I am at it. Can you say is that the only answer, that patents are somehow different? Yes. Patent claim construction is different. I think that's exactly what this Court said in Markman. Can we go back, can we go back to the question, if it's technical, it's all right for the judge to find the fact. I thought in our Seventh Amendment cases we have rejected the notion that if an issue is difficult or technical, the judge can decide it, even though it's a fact. Right. Now, there are lots of technical issues that juries are allowed to decide. What the Court recognized in Markman was that the nature of the inquiry under claim construction, and it's important to just step back for a second and put it in context, claim construction is based first on the plain language of the claims. Regardless of whether they're written for scientists or not, you're supposed to start with the plain and ordinary meaning of the claim language itself, and then as construed through the specifications, which are, again, designed to provide a reasonably clear exegesis of what the patent and the invention is, what the claims mean. And then you have the prosecution history, which can, in some instances, be complicated. But in this particular instance, where the very specific word in this patent was inquired about by two patent examiners, experts in the subject matter, and asked what does average molecular weight be — excuse me, mean in this context, they got the answer peak, asked in the exact same context, they got the answer weight. And what is — I mean, the notion in that circumstance, that this is not indefinite under the — in this situation seems to me completely indefensible. And that's —  And that's — Kagan. I'm sorry. Go ahead. Is your argument that there are no subordinate factual determinations in these kinds of cases? Or, as you opened by saying, is your argument, sure, there are factual determinations, we can come up with a zillion of them, but it's not worth the candle to figure out which is which? It's not worth the candle, because all you're going to do is create a cottage industry of trial lawyers fighting with the judge about which bucket some particular evidence fits into, and whether you can — Normally, normally it is not difficult to distinguish the one from the other. Sometimes it is. But in the cases where it isn't, which I think are vast, did that dial read 7? I have four witnesses who said it did, and I have three witnesses who said it read 5. And now let's complicate that, that it all has to do with what happened in a laboratory at a particular time. Are we going to have the three people from the Federal Circuit going in and second-guessing the judge without giving him any weight on that kind of factual question, which I suspect, I have no reason to believe it won't, will turn up comparatively just as often? Justice Breyer, I think that — I mean, I don't want to go to war with your — I don't want to go to war with your hypothetical. I want the answer. I want the answer. The problem with the hypothetical is that it assumes that there will be instances in which the question of pure science is a matter about which there is disagreement. And that is very, very uncommon. And that's why it's not working. This Court said it specifically in Markman. It said our experience in interpreting documents teaches us that they will rarely, if ever, be resolved. And the evidence we have from the Patent Office is never resolved on the basis of differences of opinion by an expert under — under these circumstances. So, as I was saying before, what are you doing? You're creating a cottage industry. But, Mr. Phillips, if that's your argument, I mean, then you just have to deal with Rule 52a, because Rule 52a sets out a very blanket rule. It doesn't say except where it's not worth a candle. It just says what it says, that these are matters for the trial court. But if — if, as this Court said in Markman, treating interpretive issues as purely legal — and the reason for doing that is to avoid the problem that Chief Justice identified, which is that otherwise you're going to end up with a single document that is binding on the rest of the world, having inconsistent meanings. And, therefore, it is different. It is different from every other issue in patent law, and I think it's different from every other issue of litigation. It is a — It's saying why it's different from obviousness, because the other side said, well, if — why shouldn't the fact-law division for claim construction be the same as it is for obviousness? Right. And the reason is, is that obviousness carries with it a whole slew of additional factual questions that ultimately will predominate, whereas — and also begins with the proposition, this is what the claim means, all right? So you start with that as a given, which is a pure question of law. The obviousness issue at that point can turn on the success of the product, can turn on how the market responded to it. Those are lots and lots of pure, factual issues that this Court already recognized in John Deere, Graham v. John Deere, and said, you know, there's no reason to have pure question of law, even if at the end of the day there is a question of law. What I took Markman to mean — let me go back to that same language — treating interpretive issues as purely legal is that there are — is that it's — it is. It's literally not worth the candle. But the right way to analyze it, the only way, effectively, to provide notice to the world is to have one court that's expert make the final judgment. That's the other part of the analysis that seems to me at least worth a little bit of comment, which is, which is the better body for making this decision? You say, Justice Breyer, you like the district court because the district court, one, may have the opportunity to listen to the witnesses, although in this case claim construction was done strictly on the papers. There were no witnesses who testified. But number two, if you go back to what the ultimate inquiry is, which is what does the term mean in the context of the patent, which is what Markman says, so it's got to be against the claim language, the specification, and the prosecution history, what are we — what is the undertaking there? Under those circumstances, treating it — giving that kind of a decision-making process, which is something the Federal Circuit does every day. Breyer, I mean, it isn't that I like it better. It is that Rule 52a says that fact-finding of the district court should be overturned only for clear error. And once I start down this road, well, that's true on some facts and not other facts, and I get into this. See, I'm not an expert. I don't see where the stopping place is. I don't see how to manage the system. And I am moved by the fact that the lawyers here are pretty much on — who know patent law, are pretty much in favor of district courts, as far as the amici are concerned. They're pretty much in favor of district courts making the fact-finding. So I don't see where to go to start drawing the lines you want to draw. I'm not sure I agree with your assessment about how comfortable the world is with the fact-finding. Breyer, I don't know. My experience is 52a, and that's the — what do I do about that? And it seems to me Markman answered 52a. Markman says it's a pure question of law, and it should all be treated as a pure question of law in order to guarantee uniformity and to provide adequate notice to the world. Sotomayor, can I clarify the point that you made in response a little earlier? You said that this was not a hearing. It is a hearing, but is it always on papers? It doesn't have to be, but in this context, this was all done on the basis of the submitted declarations and depositions. So there was no live hearing? There was no live hearing on this, no. Well, Markman hearings certainly have expert testimony, don't they? They can. They don't have to. You don't have to have Markman. When they do have expert testimony, you wanted to say that that's — doesn't involve any finding of facts to which the court feels must defer? Yes. I mean, I think that's the right answer. And the reason for it is, is that, again, you've got to put it in context. And if you use the government's theory, it's particularly striking, which is, if it's a dispute about a scientific principle apart from the patent, there are virtually none. That doesn't happen. I mean, you can read the first 25 pages of Grant's declaration. There's no disagreement between anything he said and anything that our experts said on any of those general principles of law. It is only when you get to the interpretation in the context of the patent, which is language he uses repeatedly, and then tries to — tries to take his interpretation, his reading of the patent, elevate it to a finding of fact, and giving deference to the decision-making. So what do you — what do you want the district court to do? Do you want the district court, nonetheless, even though what it finds is not going to be given any — any deference, do you want them to — to listen to witnesses? Of course. Or to take at least written testimony? I mean, where this — what you say is a rare scientific question comes up? I mean, if it's going to be decided by the court of appeals, why should the — why should the district court have any witnesses at all? And why should it say that you want them also, just to follow the same question, just not to separate conclusions of law — findings of fact and conclusions of law? That's all — that's all out. Well, in reality — No findings of fact at all. Right. Well, I mean, actually, the — the claim construction analysis is just a claim construction analysis where she goes through it. She doesn't accord — the district judge didn't accord findings of fact, conclusions of law analysis to it in the first place. She just analyzed each of the — each of the claims. So this — this district judge should not have even taken this testimony. Is that it? Oh, no. I think it's perfectly sensible to take this testimony. Really? Really. Because it helps inform even the district judge's understanding of what the patent is about in order to be able to apply the claim language, the specification and the prosecution history. Remember, at the end, all you're talking about is if you can't figure it out from everything else that's — that's in front of you, which you should be able to, will there be a situation where there is some testimony about a scientific principle apart from the patent that could get you there? And — and the situation is virtually unheard of. The patent office says no. I'm sorry, Justice Scalia. Can I try — can I try this out and see if you agree with me? If a — a patent is like public law, if it's like a statute or like a rule, then factual findings regarding the meaning of that patent are not entitled to clear error review any more than factual findings regarding the meaning of a statute or the Constitution are entitled to — to plain error review. What was the original understanding of the Second Amendment? That's a factual question, but it's not subject to plain error review. What did Congress intend, if you think Congress intended things? That's a factual question, but it's not subject to plain error review. Now, on the other hand, if a patent is private law, if it's like a deed or if it's like a contract, then Rule 52a comes into play. Do you agree with that? Yes, I agree with that. As I've said all along — So it all turns on which — how we — which one you think it's closer to. Okay. And I — but actually, I think Markman answered that, because I think Markman recognized that this is a public document that is going to be binding on third parties and that, therefore, ought to be construed as a matter of law in order to ensure the stare decisis component of it. And they rejected it. Remember, the Court — this Court specifically rejected the alternative argument put forward, I think, by the government's lawyers, suggesting that you can use collateral estoppel and other methods of dealing with fact findings or fact determinations. This Court said, no, that's not adequate. You need stare decisis in order to guarantee the kind of uniformity that only the Federal Circuit can apply to these cases. How many patents do they issue a year about? Do you have any rough idea? I'm sorry, how many patents? How many patents are issued every year? Roughly. Do you have any idea? I don't. The SG's lawyer would almost certainly be in a better position to answer that. But obviously, it's a significant number of them. There might be very different kinds of factual determinations that are relevant to patent validity than are relevant to interpretation of a statute. So let me just give you one. I mean, suppose that the validity of a patent depended on when a particular invention was made. You know, was it done in 1980 or was it done in 2000? And that was absolutely critical, your determination of whether a patent was valid. But that seems like so within the province of the trial court. So how do I — Or the jury. How do I deal with that? Yeah, but that's the priority date. And the priority date's always been recognized as a question of fact. I mean, the court — So a question of fact, which the trial court ought to get deference on, no? Yes, absolutely. But that's not a claim construction issue. That's just a question of what is the priority date for purposes of — you have to go outside the patent to get that, because you have to find out at what point other things were available, you know, how does it react to other — other filings that were made. I see. But are you saying that there aren't similar things that could arise within the context of claim construction? Just different people's view of what the facts on the ground are. You know, is molecular weight usually measured in kylodaltons or something else? Yeah. But that's the whole point. There isn't any disagreement about that. Most of those kinds of issues that are completely distinct from the patent itself where you're not just trying to figure out the language of the patent, there are very few differences of opinion about it. Everybody acknowledged, even the Federal Circuit acknowledged, that suggesting that average weight was implied — average molecular weight, weight average molecular weight was implied by the reference to kylodaltons, right, was a misstatement of law, was a misstatement of science, but I think quite rightly then drew the precise legal conclusion that I would hope this Court would affirm, which is that when a patent is issued, there are many inconsistent positions in the prosecution history in order to get two separate patents issued, one using a measure for one and one using a measure for the other, where — where, just to be clear about this, this patent is all about molecular weight. The whole purpose of this was to get — Mr. Phillips, why do you think that the Court below just didn't make that holding? To be frank with you, when I read the background of this case, your intuitive or your reaction was my own. Right. But they didn't. They didn't actually say that clearly enough. And I'm going to ask on the rebuttal what Mr. Jay would say if they said that. Is that an issue of law, that you have inconsistent positions in patent prosecution? You're bound. Yeah. I mean, I think that — I mean, whether you can — whether it's an estoppel, I don't know. But whether it's the best way to interpret the patent, regardless of what else there is in the record and the evidence, I think that's one place where the Solicitor General and we are in complete agreement that the one thing you cannot do is take fundamentally inconsistent positions in the prosecution history, create a record that says average weight — average molecular weight means weight and average molecular weight means  And I think that's a terrible way to speak when the whole purpose of this exercise is to get the weight into a certain range of kilodaltons in order to protect against toxicity. I mean, that's the whole patent. You would have thought in the ordinary course if I were writing a patent and I thought everything turned on average molecular weight, I might actually bother to define the term. Now, that may be true, but what you — and I know I'm not going to get an answer from you because I know what it will be. But my question is, where are we going if we start carving out one aspect of the patent litigation, namely the construction, and say that fact matters underlying that, brute facts, even when they are one witness versus another, are for the court on review to decide, but in all other matters, they're really clear error? I don't know where I'm going with that because I'm not an expert in this area. But you see that I'm nervous about it? I do. And I guess what I would suggest, Justice Breyer, and hopefully this is an answer to your question, is that the Federal Circuit has followed this path for well more than 20 years. No. You've seen the figures in here. The figures are they followed the path and they reversed nonstop. And it's like 30 percent or 40 percent of all the cases get reversed. Those numbers have continued to come down. And the reason they've continued to come down is that there was an enormous fight between both the district courts and the Federal Circuit about the methodology of claim construction. But the en banc decision of the Federal Circuit and Phillips made it very clear. You look at the claims, the specification, the prosecution history, the learned treatises and dictionaries, and if it's the last recourse, if need be, you can turn to experts to help you understand it. And nobody, and I'm not discouraging, Justice Scalia, the use of experts. I mean, there's reason to testify. Anybody who wants to understand certain kinds of patents are going to want to have experts come in. I can guarantee you parties are not going to present these cases to the judge without coming in with a tutorial that provides a very good explanation of how that patent operates. All of that's legitimate. And I would give a district court, if I were in the Federal Circuit, the deference that the district judge is otherwise entitled to based on the strength of the argument, the kind of lesser deference courts pay to administrative agencies in certain circumstances. Ginsburg. You're talking about Skidmore. Skidmore. Thank you. I was looking for the word, but it wasn't coming to me. You know, the notion that you're entitled to whatever deference, the power of your logic gets you to. But if you use that test here, where, as I said, Justice Sotomayor, if you're right, we'll say the same thing. I mean, you could call that deference if you like, but. Well, it's a measure of deference. But at least it gives the district court an incentive to do harder work in order to be in a position to lay claim to more deference. But what we do know here is that the prosecution history creates, to my mind, an insolubly ambiguous patent, and there's no way out of that box. And then what the court of appeals said is, is there anything in the SEC calibration data or the shifting of this and that that somehow makes this suddenly become definite enough? And the answer to that is, no, none of that does anything except suggest to a person of skill in the art that Peek could potentially have been a legitimate way to interpret that. But none of that gets you out of the box. And, indeed, every time their expert testified this, he kept saying, well, it's because the prosecution history refers to Peek. But that's only because he discounted the other half of the prosecution history that refer explicitly and completely to the weight. And it's in that context that I would hope that this Court, if it decides to go past de novo, if it thinks this exercise is worth the candle, will go beyond just simply saying there's a new standard to be applied and analyze each of the facts that have been put before the Court by the Petitioner and make a determination, because it's, one, it would be very helpful to know what the indefinite in the standard means in light of last year's decision to Nautilus, and that can be elucidated here. But, two, it seems to me that whatever else you want to say about this, this is a hopelessly indefinite set of claims. It is not entitled to protection. It should be regarded as invalid, and my clients should be able to go forward with the generics that would bring this medicine at a less expense to the population. Is there no further questions, Your Honors? Thank you. Roberts. Thank you, counsel. Mr. Jay, three minutes. Thank you, Mr. Chief Justice. I'd like to make, I think, five points. One is in response to Mr. Phillips's suggestion that there aren't going to be many cases with contested facts. This is a case with contested facts. This is a case in which — let's talk about Figure 1 in particular, because we didn't touch on that as much in the top half of the argument. The meaning of Figure 1 was crucial to the Federal Circuit, because it said — its understanding of Figure 1 was that it made it hard to credit our interpretation of the patent. But there was directly opposed scientific evidence in the district court. Would the peak shift or would it not shift? Dr. Yu said, page 375A of the Joint Appendix, no, it wouldn't. The district court found as a fact that, yes, it would. Why does the government disagree with you about that? The government agrees with us 100 percent about Figure 1. And I think the government says, and we agree with this as well, the error on Figure 1 is itself a sufficient basis to remand. And what might happen on remand, I think, you can't necessarily predict, because you can't disaggregate the — all these de novo conclusions from each other. Which were the facts that you say are facts and the government said do not qualify under that test? The government says that the SDC point about presumed meaning, and I think that the government doesn't pay sufficient attention to the presumed meaning fact-finding. But we disagree on that and on relating to the prosecution history. Now, Mr. Phillips alluded to the prosecution history, and, Justice Sotomayor, this gets to your question that you asked me to address. Can the prosecution history by itself answer this case? And the answer is no, it can't. The Federal Circuit couldn't say that it did, because when you have a patent that is sufficiently definite in light of the specification, that's the end of the matter. As the Federal Circuit said in Phillips, the prosecution history ranks below the specification as an interpretive aid. And if the patent is sufficiently definite in light of the specification, and we say that it is, and Dr. Grant said that it was, Dr. Grant referred to a number of things besides what Mr. Phillips just told you about why peak was the more likely meaning. So, for example, number average and weight average are usually seen together, peak by itself. I'm sorry, you didn't answer my question. If the Federal Circuit just simply said, mistake or not, you said it. You said it was molecular weight, not peak. You're stuck. It can't say that, Justice Sotomayor, because its own doctrine says that what you're positing is some kind of disclaimer. And a disclaimer. No, I'm positing an estoppel of some sort. Well, whichever way you see it, that requires a clear and convincing standard, a clear and unambiguous standard that they did not apply here, they could not apply here. And in particular, what we have now is the 808 patent. These two statements were made 4 years and 6 years after the 808 patent issued. If it was definite when it was issued, it's still definite today. Thank you, counsel. The case is submitted. Thank you.